*S. C. Crane,* for plaintiff. *T. J. Ripley,* for defendant.

---

## TURNER *v.* TURNER.

ATKINSON, J. 1. "In all cases where the custody of any minor child or children is involved between the parents, there shall be no prima facie right to the custody of such child or children in the father, but the court hearing such issue of custody may exercise its sound discretion, taking into consideration all the circumstances of the case, as to whose custody such child or children shall be awarded, the duty of the court being in all such cases in exercising such discretion to look to and determine solely what is for the best interest of the child or children, and what will best promote their welfare and happiness, and make award accordingly." *Tippins* v. *Tippins,* 147 *Ga.* 616 (95 S. E. 113); Civil Code, § 3022 (a) (Acts 1913, p. 110).

2. Under the pleadings and evidence in this habeas-corpus proceeding, it does not appear that the judge of the superior court erred in affirming, on certiorari, the judgment of the ordinary* in awarding the custody of the children to their mother.

*Judgment affirmed. All the Justices concur.*

No. 1680. MAY 13, 1920.

Certiorari. Before Judge Park. Putnam superior court. September 20, 1919.

The father of two boys ten and twelve years of age sought by habeas corpus to recover their custody from the mother. On the first hearing the ordinary of the county awarded the custody to Sam Solomon, the maternal uncle of the children. · A certiorari to this judgment was sustained, with instruction to the ordinary to investigate and decide as to whether the father · or the mother was entitled to the custody, "as under the law and facts

in this case the father or the mother is entitled to the possession of the minors." On the second hearing (upon the same evidence as at the first) the ordinary awarded the custody to the mother; which judgment was sustained on certiorari, and the plaintiff excepted and for assignments of error alleged: (1) that the judgment is contrary to the evidence; (2) that it is contrary to law and without evidence to support it; and (3) that the ordinary abused his discretion in the award, for the reason that the mother admits that she is not and has never been able to support the children, and on the other hand it appears that the father is able and willing to support them and is a fit and proper person to have them.

The parties (colored persons) were married in 1904, and separated in 1916. In August, 1918, the husband brought an action for a total divorce, alleging cruel treatment and desertion by the wife, and praying that the custody of the younger child be awarded to him. The petition for habeas corpus was brought and sworn to on October 7, 1918. It is therein alleged: that the mother is detaining the children at her residence; that she has refused his repeated demands, on and after October 2, 1918, to deliver them to him; that since the filing of the petition for divorce she attempted to marry Dan Clark, with whom she is living in adultery and has been so living since October 3, 1918; that no divorce has been granted to her; that she is not a fit and proper person to have control and custody of the children; that her restraint of them is illegal, because the petitioner is their father and entitled to their services and the proceeds of their labor; and that he has not at any time, by contract or otherwise, released his right. By amendment he alleged that the mother was rearing the children under immoral, obscene, and indecent influences likely to degrade their moral characters and devote them to vicious lives. The answer, dated and sworn to November 4, 1918, denies that respondent has taken from petitioner the possession and custody of the children, and that she is harboring them; but she alleges that the petitioner deserted her and them without cause about two and a half years ago, "and has never furnished her or either of said children any clothing or anything to eat, nor has he provided any place for either of said children to stay, and has never sent either of said children to school a single day, nor

given them any money, nor made any other provisions for them, and . . that she and her mother and her brother has solely provided all means of support and care of said two minor children all of their lives." She denies that any demand for them has been made of her by petitioner. She admits the alleged marriage to Clark, " after she was advised that [she] could legally do so," and under the belief in good faith that she had a legal and moral right so to do;. but denies that she ever lived in adultery with him "in any moral sense," and says that when the writ was served upon her, and her attorneys informed her that she was not legally married, she immediately separated from Clark, returned to her former home, and remained there. She denies any moral wrong in taking this step for her benefit and that of the children, and any illegality in her detention of them, and any right in petitioner to their labor and services; alleging that if ever he had any right to them he lost it by never having supported, maintained, or otherwise provided for them, and by leaving them in the care and custody of respondent, by whose labor and the aid of her mother and her brother they have been supported, maintained, cared for, and educated up to this time. She avers "that said petitioner is not a fit and proper person to have the custody and control of said children, that he is not a man of good character and has been charged with crime . . and has been in jail, and is a worthless kind of a man."

At the hearing the plaintiff testified as follows: My wife left me in August, 1916, without any cause, and has never lived with me since. I then made demand on her for the children, and have demanded them ever since, but she refused to give them to me. I heard that one of them was sick, and sent Dr. Howell to see him; but she refused to let the doctor see him. She said she did not want anything that I had. I also sent some provisions to them, and she sent me word that she did not want them; although she kept them. I have been in the pressing-club business since 1907, my income from which amounts to fifty dollars every month, and often to seventy-five or more. I entered suit for divorce because I could not get along with her. The last fuss we had: I sent her word to send my dinner, and she sent back a note (which I burned) in which she called me a dam fool and other vile names, and said that I was a sorry

man, and that she did not want me any longer. She would curse and abuse me in the presence of the children, and would sometimes mistreat them. I wanted to take care of them after she left me, and offered to do so; but she would not let me do anything for them and would not let them come to see me. I am and have always been ready, willing, and able to support and educate both of them. My wife let Dan Clark have the children to work, and they stayed with him about a year. I never did leave her; she left me.

Two witnesses testified that they had known the plaintiff a long time, and considered his character good; a third, that he considered him about an average negro, and could not say that his character was good or bad; and a fourth, that he did not consider his reputation good, but all this witness knew about it was that the bank with which he was connected once prosecuted the plaintiff for disposing of mortgaged property. He paid up all the money due the bank, and the cost, and the case was allowed to be settled (as appeared by an entry on the court docket).

The respondent testified: Pierce (plaintiff) left me in 1916, and has not supported me or the children since. I had to take in washing to pay the house-rent and support the children, Sam Solomon, my brother, and my mother helped me support them. Pierce never did support them. I did. He went off several times and stayed quite a while. I am not able to support the children now, nor have I ever been able to support them. My brother and mother helped me support them. I could not have supported them otherwise. I did not quit Pierce; he quit me. I did not write him that letter. I never cursed an oath in my life. I was living with Dan Clark as his wife when the paper was served on me, and had been living with him for several weeks. I thought I had a right so to do. Mr. Jenkins brought some kind of a paper for me to sign, and asked me if I objected to Pierce getting a divorce. I told him no, and signed the paper. I thought I was free to marry. I was regularly married to Dan Clark. I let Dan take the children and keep them to help make a living for them, as I was not able to take care of them. As soon as I discovered that I was not legally married to him I quit him, returned home, and have since been living apart from him.

Sam Solomon testified that he had helped to care for the chil-

dren for several years, and was willing to continue to help. He owned the house he lived in, but no other property. He had been several times sued for money he owed different people; times were hard, and he was helping with the children. His mother also had helped to take care of them for several years past.

*R. C. Jenkins* and *Roy D. Stubbs,* for plaintiff.

*Davidson & Callaway,* for defendant.